Thomas **KELLY** and Jonathan Prisk, Plaintiffs–Appellants,

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,** Defendant–Appellee.

No. 99–2496.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 7, 2000.

Decided Feb. 10, 2000.

Timothy P. Dwyer (argued), Zukowski, Rogers, Flood & McArdle, Crystal Lake, IL, for plaintiffs–appellants.

Ronald M. Spritzer (argued), Department of Justice, Land & Natural Resources Division, Washington, DC, Lois J. Schiffer, Asst. Atty. Gen., Andrew J. Doyle, Andrew Mergen (submitted), Environment and Natural Resources Division, U.S. Dept. of Justice, Washington, DC, Jane Woolums, U.S. E.P.A., Chicago, IL, Peggy A. Lautenschlager, Office of the U.S. Attorney, Leslie Herje, Asst. U.S. Atty., Madison, WI, for defendant–appellee.

Before POSNER, Chief Judge, and ROVNER and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

A man's home may be his castle, but our society has come to realize that just how an individual property owner uses shared resources such as water, air, and soil affects the rest of the community. Several laws protecting these resources have been enacted, and one of them, the Clean Water Act, is designed to protect this country's dwindling wetlands, a vital part of the ecosystem that purifies the water, helps control flooding, produces food, and provides habitat for birds, fish, animals, and plants. The appellants attempt to trivialize this natural resource and the law that safe-

guards it, but they offer no coherent rationale why they should get out from under a small sanction imposed upon them for violating the Clean Water Act.

Thomas Kelly owns property adjacent to Lake Koshkonong in Jefferson County, Wisconsin. Lake Koshkonong is part of the Rock River, which eventually empties into the Mississippi River. Kelly's property includes a 3.5-acre "swale," or low-lying marsh. The marshy area performs several ecological functions: absorbing nutrients and purifying the water; allowing a variety of trees and plants to grow; and providing food and shelter for herons, kingfishers, muskrats, pheasants, rabbits, squirrels, red foxes, snipes, ducks, geese and their goslings.

Kelly, though, was more interested in making a buck than saving a duck. He bought the property with the aim of turning it into a subdivision. He built a road, extended utilities, cut down trees, cleaned up garbage, obtained a permit from the county to riprap the shoreline and fill in part of the property, and began filling in the swale. Dale Pfeiffle of the Army Corps of Engineers visited the property in August 1990, observed fill in about 30 percent of the swale, and took note of the land's wetland characteristics. Pfeiffle told Kelly that, in addition to the county permit, he needed a federal permit to discharge fill material into the swale. Later, an application for a permit was mailed to Kelly. Kelly consulted an attorney, who told him he didn't need permission from the feds to continue his development of the land. This was bad advice. Kelly continued filling in the swale without bothering to get a permit. By the time Pfeiffle returned to the property in September 1990, almost 90 percent of the swale contained fill material. Finding that Kelly violated the Clean Water Act by filling in a wetland without a permit, the EPA ordered him to remove the fill and restore the swale to its prior condition. No fine was ordered, and Kelly complied. A friend of his, Jonathan Prisk, did some of the restoration work.

Flooding in the summer of 1993 left brush and root stumps on Kelly's land. He burned what he could and decided to bury the rest. He hired Prisk to dig pits in the swale, bury the debris, and level things off. Prisk asked if a permit was required and suggested burying the debris upland away from the swale, but Kelly told him, in effect, "Don't worry; be happy." This, too, was bad advice. On January 28 and February 1, 1994, Prisk used a backhoe to dig eight pits in the swale, deposit brush, and then cover the pits. William Meyer of the Army Corps of Engineers visited the property on February 1 and saw what Prisk was doing. Meyer and the EPA's Gregory Carlson visited the property again a few days later and observed eight covered pits, large ruts in the soil resembling tire tracks, and clots of earth bereft of vegetation. Carlson estimated that the fill activities had disturbed two of the swale's 3.5 acres and that 800 cubic yards of fill had been dumped in the swale.

The EPA sought a $6,000 administrative penalty against Prisk and a $4,000 administrative penalty against Kelly for violating the Clean Water Act by filling in a wetland. An administrative hearing was held in 1996 at which Pfeiffle, Meyer, Carlson, Kelly, and a local sportsman named Richard Persson testified. (Prisk did not attend but was represented by his lawyer, who also was representing Kelly.) In August 1998 David A. Ullrich, EPA's acting regional administrator at the time, assessed the requested $4,000 penalty against Kelly and lowered Prisk's penalty to $3,000 because he was viewed as the least culpable of the two. Kelly and Prisk appealed to the district court, but the EPA's decision was upheld.

■ We review *de novo* a district court's decision to affirm the decision of the EPA's regional administrator. *See Mahler v. U.S. Forest Service,* 128 F.3d 578, 582 (7th Cir.1997). No court will set aside civil penalties assessed by an agency "unless there is not substantial evidence in the record, taken as a whole, to support

the finding of a violation." 33 U.S.C. § 1319(g)(8). Evidence is substantial if a reasonable mind might accept it as adequate to support a conclusion. *Hoffman Homes, Inc. v. EPA*, 999 F.2d 256, 261 (7th Cir.1993).

Congress enacted the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Act prohibits discharging pollutants into navigable waters without a permit from the Army Corps of Engineers. 33 U.S.C. §§ 1311(a), 1344, 1362(6), (7) and (12). Pollutants include dredged spoil, biological materials, rock, and sand. 33 U.S.C. § 1362(6). Navigable waters include wetlands, 33 C.F.R. § 328 (*see also United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 132–35, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985); *Solid Waste Agency of N. Cook Co. v. U.S. Army Corps of Eng'rs*, 191 F.3d 845, 851 (7th Cir.1999); *Village of Oconomowoc Lake v. Dayton–Hudson Corp.*, 24 F.3d 962, 964 (7th Cir.1994)), which are "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(b).

Kelly and Prisk argue that because they did not knowingly violate the law they did not violate the law. This argument fails for at least three reasons.

■ First, although Kelly and Prisk's brief makes scattered references to not knowingly violating the statute, it fails to explain their argument that knowledge is required for a violation. Undeveloped arguments are waived. *See JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 780–81 (7th Cir.1999); *United States v. Watson*, 189 F.3d 496, 500 (7th Cir. 1999).

■ Second, nothing in the statute makes good faith or a lack of knowledge a defense. Negligence or knowledge is expressly required to trigger the statute's criminal penalties, 33 U.S.C. § 1319(c), but no such requirement exists for civil or administrative penalties, 33 U.S.C. § 1319(d) and (g). Civil liability under the Clean Water Act, therefore, is strict. *See United States v. Winchester Mun. Util.*, 944 F.2d 301, 304 & n. 1 (6th Cir.1991); *United States v. Texas Pipe Line Co.*, 611 F.2d 345, 347 (10th Cir.1979); *United States v. Earth Sciences, Inc.*, 599 F.2d 368, 374 (10th Cir.1979); *Minnehaha Creek Watershed Dist. v. Hoffman*, 597 F.2d 617, 627 (8th Cir.1979).

■ Third, even if knowledge was required for a violation, the run-in with the feds in 1990 made Kelly (who was ordered to undo the damage) and Prisk (who did some of the actual work of undoing the damage) aware that putting material in the swale was a no-no. Their sob story about being ignorant of the federal regulations might have been credible the first time, but they obviously chose with, at best, their eyes wide shut, to disregard the law the second time around.

■ Kelly and Prisk also suggest that they did not violate the law because stuffing dead vegetation in the swale caused no environmental harm. Again, there is evidence that their actions caused some damage. But, again, they miss the larger point: The Clean Water Act does not forbid all filling of wetlands—it forbids the filling of wetlands without a permit. "The permit process is the cornerstone of the ... scheme for cleaning up the nation's waters." *United States v. Huebner*, 752 F.2d 1235, 1239 (7th Cir.1985) (internal quotations omitted). The purpose of requiring federal approval beforehand is to prevent or minimize aquatic damage. Kelly's actions might well have received federal approval. (In fiscal year 1994, for example, less than 1 percent of permit applications were denied. *See* U.S. Environmental Protection Agency, *Facts about Wetlands*, (revised May 25, 1999),

<http://www.epa.gov/owow/wetlands/fact/facts5.html>.) The problem is that Kelly never allowed the process to work. Driving a car without a license is not necessarily dangerous, but it is illegal. Likewise, digging eight pits in a marsh might not cause massive environmental trauma, but doing so without a permit violates the Clean Water Act.

There is substantial evidence in the record that the fill placed in the swale was a pollutant, that the swale was a wetland, that Kelly and Prisk did not have a permit, and therefore that the two men violated the Clean Water Act.

 Kelly and Prisk also contend that the amount of the civil assessments were too high and retaliatory. But we will not set aside civil penalties assessed by the Agency unless they constitute an abuse of discretion. 33 U.S.C. § 1319(g)(8). An abuse of discretion by an agency involves a decision made without a rational explanation, a decision that departs from established policies, or a decision that rests on an impermissible basis. *See Osuch v. INS*, 970 F.2d 394, 396 (7th Cir.1992).

 Factors that influence the amount of the penalty include the nature of the violation, circumstances of the violation, extent of the violation, gravity of the violation, the violator's ability to pay, any prior history of such violations, the degree of culpability, economic benefits resulting from the violation,and such other matters as justice may require. 33 U.S.C. § 1319(g)(3). The EPA took these considerations into account, noting that protecting wetlands is important, that violating the Clean Water Act is serious, that Kelly and Prisk knew about the law because of the 1990 incident, and that Kelly was more culpable than Prisk because he owned the land and directed the violations. The EPA also said deterrence was appropriate in this case because 100 of Kelly's neighbors had signed a petition saying they supported what he had done. Civil penalties under the Clean Water Act are intended to punish culpable individuals and deter future violations, not just to extract compensation or restore the status quo. *Tull v. United States*, 481 U.S. 412, 422–23, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987).

Kelly and Prisk suggest that the fines were out of proportion to the environmental damage caused. They are wrong, for the fines actually were quite modest. The EPA could have sought civil penalties up to $25,000 per day of violation. 33 U.S.C. § 1319(d). Instead, the EPA chose to assess administrative penalties, where the maximum fine was $10,000 each. 33 U.S.C. § 1319(g)(2)(A). The $4,000 civil assessment against Kelly and the $3,000 assessment against Prisk were well within the statute's monetary range.

 Kelly and Prisk complain that the lack of discovery allowed in these proceedings precluded them from showing that the EPA was retaliating against them. But there is no constitutional right to pretrial discovery in administrative proceedings. *Silverman v. Commodity Futures Trading Comm'n*, 549 F.2d 28 (7th Cir. 1977). The Administrative Procedure Act contains no provision for pretrial discovery in the administrative process and the Federal Rules of Civil Procedure do not apply to administrative proceedings. *Id.* However, Kelly and Prisk could have investigated the government's motives by cross-examining witnesses during the administrative hearing, by requesting government documents under the Freedom of Information Act, or by filing suit against the government.

What Kelly and Prisk hoped to uncover is a mystery, though, because their accusations of retaliation make no sense. They say there is something sinister about the fact that the EPA's enforcement actions did not begin until September 1994, shortly after Kelly called the Army Corps of Engineers about getting a permit and 7 months after the violations occurred. Kelly could be fined for what he did in February regardless of whether he got a permit in September. Seeking modest fines

against individuals who twice defied the law sounds to us not like retaliation, but like an agency that was—if anything, cautiously—carrying out its responsibilities.

■ Kelly and Prisk's last-gasp argument is that the $7,000 in fines violated the "excessive fines" clause of the Eighth Amendment. But we can't say the fine is grossly disproportionate to the gravity of the offense when Congress has made a judgment about the appropriate punishment. *See United States v. Bajakajian*, 524 U.S. 321, 118 S.Ct. 2028, 2037–38, 141 L.Ed.2d 314 (1998). The inherently imprecise decision to fine Kelly and Prisk a total of $7,000 was not grossly disproportionate to the violation of an important environmental safeguard that could have drawn a total fine of $100,000 ($25,000 civil penalty multiplied by 2 days multiplied by 2 offenders).

Disliking a law may be the basis for a letter to the editor, but it does not give one a license to break the law nor does it create grounds for an appeal. Kelly and Prisk might have argued that the stumps and other rotting vegetation they were burying in the wetland do not qualify as pollutants. They might have argued that the land was not a wetland in the first place. They might have argued that finalizing the fine 4 ½ years after the violation was too late. They might have argued that the agencies' expansive definition of "waters of the United States" that are subject to regulation is too broad. *See United States v. Wilson*, 133 F.3d 251 (4th Cir.1997). They might have argued that the vegetation was somehow incidental fallback from material they were trying to remove from the area and thus not subject to the regulation. *See National Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1405 (D.C.Cir.1998). We do not mean to suggest that any of these argu-

ments would have been successful, but they surely would have stood a better chance than the approach Kelly and Prisk took on appeal. Their brief cited only three cases and blithely declined to repeat issues it claimed were contained in the record. Their argument is essentially nothing more than a diatribe against federal power under the Clean Water Act. It has been unpersuasive. The judgment of the district court upholding the penalties assessed by the EPA is

AFFIRMED.